## American Arbitration Association
## Voluntary Labor Arbitration

In the Matter of the Arbitration Between:

## INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, et al.
#### Plaintiffs/Union.

|  |  |
|---|---|
| AAA No.: | 54 300 00195 12 |
| Issue: | Retiree Benefits |
| Arbitrator: | Michael P. Long |

- and -

## TRW AUTOMOTIVE U.S., LLC.
#### Defendant/Employer.

_____/

| BACKGROUND |
|:---:|

On November 2, 2012 a Notice of Appointment of Arbitrator was issued by the American Arbitration Association appointing Michael P. Long as arbitrator.  An arbitration tribunal was convened according to the Voluntary Labor Arbitration Rules of the American Arbitration Association pursuant to an order from the United States District Court, Eastern District of Michigan, Southern Division. In an order granting defendant's motion to compel arbitration the court ruled in pertinent part as follows:

> **IT IS ORDERED** that defendant's motion to compel arbitration [Docket No. 8, filed January 25, 2012] is granted. The parties are ordered to submit their dispute to arbitration pursuant to the grievance procedure contained in the collective bargaining agreement.  Any party may file a motion to reopen the case after the arbitration has concluded.

> **IT IS FURTHER ORDERED** that defendant's rule 56 (d) motion [Docket No.13, filed February 21, 2012] is deemed **MOOT**.

UAW, et al.                                                                                  Page 2 of 24.
**TRW AUTOMOTIVE U.S., LLC.**
AAA 54 300 00195 12; Retiree Benefits

The Court's Order references a collective bargaining agreement between the parties as the basis for decision and states in pertinent part:

> "… In 2005, UAW and TRW negotiated the last of a series of CBAs. On August 17, 2005, TRW announced that it planned to close the Sterling Heights facility. The parties agreed to extend the final CBA, dated August 6, 2002, until an agreement was negotiated regarding the closing of the Sterling Heights facility; an agreement was not reached. On September 14, 2011, TRW stated by letter that, effective January 1, 2012, it would discontinue providing Medicare-eligible retirees and surviving spouses' healthcare. Instead TRW would provide Health Reimbursement Accounts funded at TRW's discretion.
>
> The relevant CBA provides the following grievance procedure:
>
> **4.1 Exclusive Remedy.** The Union and the employees agree that the grievance and arbitration procedures provided herein are adequate to provide a fair and final determination of all grievances which may arise out of the employment relationship during the term of this Agreement and that such procedures shall be the exclusive remedy, for the enforcement by them of any claim against the Company. Nothing contained herein, however, shall preclude an employee covered by this Agreement from filing a charge of illegal discrimination with the Equal Employment Opportunity Commission.
>
>> 4.1.1 Grievance Denied [Defined]. A grievance is any complaint, dispute or controversy in which an employee or the Union claims that the Company has failed to carry out a provision of the Agreement and which involves a question concerning the interpretation or application of or compliance with this Agreement, including any question relating to rates of pay, hours of work and other conditions of employment of any employee.
>
> TRW now seeks to enforce the grievance procedures of the CBA and compel arbitration of the parties' dispute. . . ."

In its analysis the Court indicates that it proceeds under, the presumption that national labor policy favors arbitration. It notes that Plaintiffs argue that the presumption of arbitrability does not apply to their dispute because they are no longer employees under the CBA and are not specifically named in the CBA. The Court disagrees, and states that the provision at issue provides that "all grievances which may arise out of the employment relationship during the term of this Agreement" will be "the exclusive remedy for the enforcement by [the Union and the employees] of any claim against the Company. Grievances encompass any dispute where the Union or an employee 'claims that the Company failed to carry out a provision of the Agreement and which involves a question concerning the interpretation or application of or compliance with this Agreement.' ..." The Court determined that the retirees must submit their dispute to arbitration.

A Demand for Arbitration was filed by the UAW. This arbitration is conducted in accordance with the Order of the Court and the Demand for Arbitration filed by the UAW.

Article 4.4 of the collective bargaining agreement, entitled Step III, Arbitration, states that the party giving the notice that it desires arbitration of any matter shall all apply in writing to the American Arbitration Association [normally through a Demand for Arbitration] for the appointment of a suitable disinterested person to serve as impartial arbitrator, and furnish the other party with a copy of its application. The contract further states:

> "Said Association shall thereupon appoint such impartial arbitrator from its staff of arbitrators. Such arbitration shall be conducted in accordance with the rules of the American Arbitration Association provided, however, that no opinion or award of the arbitrator shall be published without the consent, in writing, of both the company and the union. ... The impartial arbitrator shall not have authority to alter or

UAW, et al.
TRW AUTOMOTIVE U.S., LLC.
AAA 54 300 00195 12; Retiree Benefits

Page 4 of 24.

> modify this agreement. Each party shall bear the expense of its own
> representatives; and all other expenses of the arbitration, if any, shall
> be shared equally by the parties. The award of the impartial arbitrator
> shall be final and binding upon the parties and upon all employees and
> persons affected, all of whom agree to abide by his award. The
> expenses of the impartial arbitrator, if any, shall be shared and paid
> equally by the parties."

In the Demand for Arbitration, the UAW stated that it filed the demand for itself
and all others who may be encompassed by the 30 September, 2012 order of the
United States District Court in UAW, et. al., v. TRW Automotive, E.D. Mich, case
no. 11-14630 (class action) (Hood, J.) granting TRW's motion to compel arbitration.

The UAW added that the order by its terms covers retirees as defined in the class
action filed with the district court. "This arbitration demand encompasses those
retirees, their dependents and surviving spouses, and any other retiree, dependent,
or surviving spouse who now may be, or may in the future become, subject to the
order, (1) to the extent that UAW has the authority to act for those individuals, and
(2) to the extent that the jurisdiction exercised by the duly-selected arbitrator
includes those individuals, and (3) consistent with any rulings issued by that
arbitrator, and (4) consistent with any further orders of any appropriate court,
including the United States Court of Appeals for the Sixth Circuit where an appeal
of the district court's order is pending.

The UAW states that this proceeding challenges TRW's unilateral discontinuation
of retirement health insurance on 1 January 2012 and substitution of individual
health retirement accounts maintained and funded subject to TRW's self-declared
and contested "right to amend or terminate" those accounts.  The UAW seeks to
enforce TRW's collectively-bargained retirement health insurance promises, that it

UAW, et al.                                                                    Page 5 of 24.
TRW AUTOMOTIVE U.S., LLC.
AAA 54 300 00195 12; Retiree Benefits

asserts were broken when TRW unilaterally terminated health insurance for retired
formerly-UAW-represented employees and the retirees' family members and
surviving spouses age 65 or over.

The UAW indicates that the retirees were employed by TRW in a now-closed
Sterling Heights, Michigan industrial plant where they were members of a UAW-
represented collective bargaining unit. They are entitled to collectively-bargained
lifetime retirement health insurance and got this insurance, provided by TRW from
the retirees' various retirement dates until 1 January 2012, when TRW
discontinued the insurance and unilaterally substituted the individual accounts.

Under the "Remedies Sought" section of the Demand for Arbitration the UAW asked
the arbitrator to:

1. Declare that by terminating retirement health insurance, and by substituting
   individual health retirement accounts for the health insurance subject to
   TRW's self-declared "right to amend or terminate" those accounts, TRW
   breached the governing CBAs and the ERISA-regulated health insurance
   plan, violated ERISA, and breached its fiduciary duties, and

2. Declare that TRW is liable, for those breaches and violations, and

3. Direct TRW to cease its CBA breaches and ERISA violations and to rectify
   those breaches and violations (A) by restoring the status quo ante, and (B) by
   making retirees, dependents, surviving spouses, and UAW whole for all
   expenses, costs, fees, and losses incurred as a result of the TRW's breaches
   and violations, and

4. Direct TRW to take suitable action to ensure full and prompt "make whole"
   relief, including gathering the information necessary to quantify "make
   whole" amounts from its records and from the records of the retirement
   benefits administrators employed and directed by TRW, and to fully and
   promptly reimburse those "make whole" amounts, with interest, and

5. Direct TRW to maintain promised and vested health insurance for the lifetimes of the retirees and their dependents and surviving spouses, without unilateral change, and

6. Direct TRW to pay the costs and expenses and attorney fees of UAW, class counsel, and the retirees and their dependents and surviving pouses encompassed by this arbitration, incurred in connection with the litigation and the arbitration proceedings, under 29 U.S.C. §1132(g)(1) and otherwise, and to pay such other costs, expenses, fees, compensatory, and exemplary, amounts as may be warranted, and

7. Award and direct such other relief necessary to make retirees, their dependents and surviving spouses, and UAW whole and as may be warranted by the governing CBAs, law, and equity.

The arbitrator was appointed pursuant to Section 4.4 of the collective bargaining agreement through the aforementioned Order of the Court. The case progressed through the arbitration pre-hearing procedures, which required a preliminary decision regarding the subpoena of records. A hearing date was set. Prior to the date set for hearing, the parties entered into the following stipulation:

> The UAW and TRW Automotive U.S. LLC will submit to the Arbitrator by electronic mail at 4:00 pm on February 15th cross-motions for summary judgment, with exhibits and declarations, in a format similar to that prescribed by Fed. R. Civ. P. 56. Hard copies will be sent by overnight mail for Saturday delivery. The motions will be limited to the issues of contract interpretation and breach. The parties each reserve the right to present further evidence to address issues unresolved by the Arbitrator's decision on the motions, including any factual disputes; ERISA issues; *etc.*

> The parties will then appear before the Arbitrator on February 21st for oral argument and questions from the Arbitrator regarding the

> motions and the relevant factual declarations.  At the conclusion, the
> Arbitrator can instruct the parties to present additional evidence on
> any points where the Arbitrator believes such evidence would be
> helpful. In addition, the parties will advise the Arbitrator if they
> believe additional evidence would be helpful. If such additional
> evidence is to be provided, the hearing will reconvene on February
> 27th. The Arbitrator and the parties can set any additional
> proceedings as necessary.
>
> Compliance with any subpoenas issued in these proceedings shall be
> postponed, and shall be rescheduled as may be directed by the
> Arbitrator as necessary following the decision, except that compliance
> with the subpoena for retiree addresses shall not be postponed."

The arbitration hearing was conducted according to the stipulation of the parties
and in conjunction with the Labor Arbitration Rules of the American Arbitration
Association and the Order of the Court.  The parties had the opportunity to
articulate their positions and offer argument, as well as the opportunity to avail
themselves of any or all of the options set forth in the stipulation regarding the
hearing.

Appearing on behalf of the UAW et al is William Wertheimer, Attorney at Law and
Maneesch Sharma, Associate General Counsel, International Union, UAW.
Appearing on behalf of TRW is Gregory V. Mersol and Todd A. Dawson, Attorneys
at Law, of the law firm of Baker & Hostetler, LLP.  The pre-hearing briefs of the
parties together with attachments were entered into the arbitration hearing record.
These documents included the collective bargaining agreement, which was
referenced by the Court as controlling regarding the contested benefits and
procedures.

At the conclusion of the hearing, the parties determined to close by way of written

briefs.  A briefing schedule was established by the arbitrator facilitating the

simultaneous filing of briefs by both parties through the Case Manager of the

American Arbitration Association.  Upon receipt of the briefs, the proceedings were

closed.  The matter is now ready for decision.


The arbitrator reviewed the collective bargaining agreement submitted into

evidence, paying special attention to the provisions cited by the parties as relevant

to this dispute.  The arbitrator took very special notice of **Paragraph 32 – Insurance**

(including all of Paragraph 32's sub sections), which set forth the insurance benefits

and coverage for employees and retirees covered by the collective bargaining

agreement.  The contract terms state in pertinent parts:


### Insurance

**32.1 Hospital – Surgical – Medical.**  Effective January 1 1999, arrangements for
participation by employees with seniority in Blue Cross/Blue Shield will be
established, subject to their continued availability and in conjunction with the
conditions set forth below.

**32.1.1 Coverage.** The coverage set forth below shall be subject to a co-insurance
arrangement of eighty-five percent (85%) Company payment and fifteen percent
(15%) employee payment of all applicable hospital-surgical-medical expenses. A
deductible amount of $100 per calendar year for employee only and $200 per calendar
year for employee and eligible dependents shall be applied to all eligible expenses
incurred. However, the maximum out of pocket expense of $500 per calendar year for
employee only or $1,000 per calendar year for an employee and eligible dependent
shall be applied excluding the deductible amounts indicated . . .
This coverage remains in effect until December 31, 2002. Employees that retiree
January 1, 2003, will also be eligible for the 85/15 Blue Cross Blue Shield Plan.

Effective January 1, 2003, the coverage set forth below shall be subject to a co-
insurance arrangement of eighty percent (80%) Company payment and a twenty
percent (20%) employee payment of all applicable hospital-surgical medical expenses.
A deductible amount of $200 per calendar year for employee only and $400 per
calendar year for employee and eligible dependents shall be applied to all eligible
expenses incurred. However, the maximum out-of-pocket expense of $1000 per
calendar year for employee only or $2,000 per calendar year for an employee and
eligible dependents shall be applied excluding the deductible amounts indicated.

**32.1.1.1 Prescription Drug Plan**. The company will continue to make available to

eligible employees, their eligible dependents and eligible retirees and their eligible dependents the Prescription Capital Drug Expense Group Benefit Program with a deductible amount, effective July 1, 1986, (co – payment) of $2.00 for generic brand drugs; and a deductible amount (co – payment) of $5.00 for name brand drugs, subject to the continued availability by the carrier. This plan will remain in effect until December 31, 2002. Employees that retire January 1, 2003, will also be eligible for this plan.

**Prescription Drug Plan**: effective January 1, 2003, the Company will continue to make available to eligible employees, their eligible dependents and eligible retirees and their eligible dependents the prescription drug expense group benefit program with a co-pay amount of $5.00 for generic brand drugs and a co-pay amount of $10.00 for name brand drugs subject to the continued availability of the carrier. Existing retirees will have a co-pay amount of two dollars for generic brand drugs and a co-pay amount of five dollars for name brand drugs.

**32.1.2 Company Contributions**. [This paragraph covers Company contributions for active employees.]   …

**32.1.3 Optional Plans.**  Each employee shall continue to be afforded the option to subscribe to health alliance plan or blue care network in place of the hospital surgical medical coverage provided for above enrollment periods will be provided in accordance with the procedures of the respective plans, but not less frequently than once a year. The company will continue to make monthly contributions on behalf of the subscribing employees toward the cost of Health Alliance Plan or Blue Care Network on the same basis as for hospital surgical medical coverage provided for above. Additionally, each employee eligible for hospital-surgical-medical coverage shall have the option to subscribe to such other health maintenance organization plans as may be offered to employees by the Company. Any such additional plans offered shall be made available under the same terms and conditions as Health Alliance Plan or Blue Care Network coverage offered under this paragraph. In the event that the premium charged by either of the two optional plans described above exceeds what is considered a reasonable premium charge for the level of service, the Company reserves the right to substitute other optional medical plans that provide similar coverage to the above carriers.

**32.1.3.1  Employees hired on or after November 1, 2002.** …

**32.1.3.2  For all employees hired at November 1, 2002.**  …

**32.1.5  Extended Coverage During Layoff.**  …

**32.1.5.1 Loss of Benefit – Return.**  …

**32.1.4 Retired Employees**. Subject to Paragraph 32.1.8, the Company will continue to make suitable arrangements for retired employees to continue such coverages as they had at the time of retirement, subject to the continued availability of such coverages by the carrier. The Company will continue to make monthly contributions on behalf of subscribing retired employees and their eligible dependents towards the cost of such coverage equal to the subscription rate or premium charge for all premiums, but for retired employees enrolled in the coverage described in Paragraph 32.1.3, not in excess of the amount which the Company would contribute had the retired employees subscribed to the coverages provided in paragraph 3 2.1.1.  The cost of such coverage in excess of the Company's contributions will continued to be paid by the retired employee. In the event such additional contribution is required, suitable arrangements will be made for the deduction of such contributions of each retired employee who elects this coverage from the monthly retirement benefit payable to him under the Retirement Income Plan by the Trustee there under.

**32.1.4.1 Surviving Spouse of Retired Employee.** Subject to Paragraph 32.1.8, the Company will continue to make suitable arrangements for the surviving spouse of a retired employee (and during the lifetime of the surviving spouse, his eligible dependents) to continue the coverage provided before the death of the retired employee, subject to the continued availability of such coverage by the carrier provided that essentially duplicate coverage is not available without cost to such spouse. The cost of such coverage equal to the subscription rate of premium charge for all premiums shall be paid by the Company, but for a surviving spouse enrolled in the coverage described in Paragraph 32.1.3, not in excess of the amount which the company would have contributed had the surviving spouse subscribed to the coverages provided in paragraph 32.1.1.

…

**32.1.8.1 Effect of Eligibility for Governmental Benefits.** The provisions of this Paragraph 32.1 shall not be applicable to former employees or retired employees (and/or spouses) who are or may become eligible for hospital-surgical-medical expense benefits under Federal law providing such benefits for the public at large. However, such provisions shall apply to active employees over age sixty-five (65) unless they have specifically rejected the Company-sponsored benefits provided under this Paragraph 32.1. Compliance by the Company with such laws shall be deemed full compliance with the provisions of this hospital-surgical-medical program with respect to employees or former employees eligible for benefits under such laws. If, as a result of such laws, the level of benefits provided by any group of employees or former employees or their dependents is generally lower than the corresponding level of benefits under Paragraph 32.1, the Company shall, upon mutual agreement with the Union, provide plan of benefits supplementary to the benefits provided by law to the extent necessary to make total benefits as nearly comparable as practicable to the benefits provided in Paragraph 32.1 with such contributions by employees or former employees as are mutually determined to be consistent with the contributions established in this Paragraph 32.1.

**32.1.8.2 Substitution of Plans**. The provisions of paragraph 3 2.1.8.1 to the contrary notwithstanding, and upon mutual agreement between the company and the union,

the company may, if such laws permit, substitute a plan of benefits for the benefits
provided by the laws referred to in paragraph 32.1.8.1 and modify the applicable
provisions to the extent and in the respects necessary to secure the approval of such
substitution from the appropriate governmental authority the Company may make
such plan available to employees and former employees and require from them such
contributions as are mutually determined to be consistent with the contributions
established in this paragraph 32.1.

## ISSUE

Simply stated, the issue in this case is whether the adoption of the HRA structure as implemented by TRW constitutes a breach of contract.

TRW asserts that the Union's claim should be denied in its entirety. It further indicates that even if a breach of contract is found, because the policies that retirees have purchased with TRW-provided HRA funds are individual policies, TRW has no right or ability to cancel them. Moreover, TRW cannot secure alternate coverage for retirees for whom the individual policies remain in effect. Thus, while TRW respectfully submits that the Union's claim should be denied, the company requests that the Arbitrator invite further input from the parties prior to issuing any order providing relief.

The UAW asserts that TRW has breached the collective bargaining agreement, and asks the arbitrator to (1) award summary judgment for the UAW; (2) direct TRW to restore the *status quo ante*; (3) permanently enjoin TRW from making future unilateral changes in the restored retirement health insurance; (4) direct TRW to identify and disgorge undeserved gains and to identify and make retirees whole for their losses incurred due to TRW's breaches and violations; and (5) direct TRW to otherwise fully comply with its CBA obligations.

UAW, et al.                                                              Page 12 of 24.
TRW AUTOMOTIVE U.S., LLC.
AAA 54 300 00195 12; Retiree Benefits

---

| DISCUSSION |
| :-: |

The task of the arbitrator is to seek out and thereafter direct the proper application of the terms of the agreement in line with the demonstrated mutual intentions of the parties.

Where the language is unclear or subject to more than one reasonable interpretation, it is the fundamental job of the arbitrator to determine what the parties intended when they agreed to the language.  Implicit in the written agreement must be the idea that the negotiators negotiated in good faith and arrived at their agreement by fair dealing and with a degree of mutual trust.  The arbitrator should consider relevant extrinsic evidence where appropriate in order to discern the parties' intent.

Arbitrators determine the intent of the parties from various sources, including the express language of the agreement, statements made at pre-contract negotiations, bargaining history, and past practice.  Constructions favoring the purpose of the provision are to be favored over constructions which tend to conflict with the purpose of the provision.  The collective agreement should be construed, not narrowly and technically, but broadly and so as to accomplish its evident aims.

Ordinarily all words used in an agreement should be given effect. The fact that a word is used indicates that the parties intended it to have some meaning and it will not be declared surplusage if a reasonable meaning can be given to it consistent with the rest of the agreement.  Words in an agreement must not be ignored or rendered nugatory.  The criterion of interpretation is the intent of the parties and not an alternate meaning that can possibly be read into provisions.

Agreements are enforceable in accordance with their clear meaning. Past practices and old understandings to the contrary have limited value, if any, where the language of the agreement is clear, direct, and certain. In the absence of an ambiguity in the written language of a contract, the arbitrator must apply the language exactly as written.

Although the parties may attempt to place forced interpretation on a given provision, the arbitrator must make a determination based on the clear common everyday meaning of the contract language as it appears to the neutral reader.

In order to determine the intent of the parties regarding the proper interpretation and application of the collective bargaining agreement (CBA) language, a look at the context in which the language exists is desirable. The following facts presented by the Union are not rebutted.

The 2002-2005 CBA had an expiration date of 31 October 2005. On 17 August 2005 TRW announced that it would be closing the plant. The UAW and TRW entered into negotiations regarding the effect of the closing. In these negotiations TRW made five written proposals for a "proposed closure agreement." TRW on 10 November 2005 first proposed reducing the retiree medical benefits of existing retirees and those eligible to retire in exchange for other benefits. In its fourth proposal TRW proposed that employees eligible to retire receive a bonus in exchange for agreeing to reduce retiree medical benefits. Its last proposal on 22 February 2006 included a provision reading: "Notwithstanding, the Company retains the ability to make reasonable modifications to said Retiree Medical Plan while still providing meaningful retiree medical coverage." This proposal also included a buyout provision wherein eligible employees would be paid either $100,000 in exchange for a voluntary irrevocable election to opt out of the medical plan or $45,000 to opt out

of this plan until age 62. The UAW did not agree to any of these proposed closure agreements.

The UAW and TRW did as part of the plant closing negotiations execute in writing an agreement that in relevant part reads: "Without limiting the parties' rights and obligations with respect to the plant closure and the discussions thereof, the parties, do hereby agree that the current collective bargaining agreement shall be extended until a Plant Closing Agreement is reached." The parties have not to date reached a plant closing agreement.

The only changes in medical coverage that TRW had made from the time of the plant closing until January, 2012 are :

Effective 1 January 2007 TRW transferred the administration of benefits for Medicare-eligible retirees from Blue Cross/Blue Shield to Humana. In a letter dated 6 October 2006, TRW informed retirees: "There are no reductions in your covered benefits or available level of service. On the contrary, you likely will experience numerous enhancements as a result of this change."

Effective 1 January 2010 TRW did limit coverage for the proton pump inhibitor prescription drugs to prior authorized cases of Barrett's Esophagus and Zollinger-Ellison Syndrome for the stated reasons that for other conditions, effective alternatives were available with lesser risks for retirees.  Also effective 1 January 2010 TRW changed from Humana's Medicare Advantage PFFS plan to a Medicare Advantage PPO but the scope and level of benefits did not change. Finally, TRW by letter dated 30 November 2010 advised a retiree that erectile dysfunction drugs would only be provided for medically accepted conditions and that participants who had been covered for such drugs in the past for reasons other than a medically accepted condition had been covered due to an administrative error.

Since the time that TRW closed the plant it has made attempts to buy out the lifetime retiree medical benefits from retirees. For example, in 2006 TRW sent a retiree a personalized statement providing him with an option of receiving $169,524 in exchange for permanently opting out of the TRW medical plan. In 2007 TRW extended another written buyout offer to the retiree, this time for $90,000. In 2010 TRW made another offer to the same retiree, this time for $50,000. Each time the retiree declined.

On 1 January 2012, TRW discontinued group insurance for those age 65 and over. TRW replaced the insurance with the limited individual HRAs. These changes were made by TRW unilaterally, without union agreement or retiree consent.

The HRAs provide "funds" which retirees can use to "purchase one of several individual Medicare policies" and for other "eligible health care expenses." TRW "will contribute money" to the HRAs "instead of subsidizing" group health insurance. TRW reportedly made a "one-time contribution of $15,000" for each "eligible" retiree and spouse for 2012 and "will provide a $4,800 credit in the HRA" for each "eligible" retiree and spouse in 2013.  TRW says it may "make additional contributions at our sole discretion (or as required by law) into the future." TRW "discretion" in "2014 and beyond" is to be "based on health care costs, legislative changes, and other factors."

The HRAs are not "funded." Rather, each is "a hypothetical account" which is to be "credited hypothetically" by TRW.  Addressing 2012, the TRW representative testified that TRW will credit each retiree with $15,000 for the year, but that "the retiree bears the risk of exceeding the $15,000." She testified that pre-2012, the healthcare expense risk was borne by TRW or the insurer providing the company-paid coverages, but, with implementation of the HRAs, "that risk has now been shifted to the retiree."

Under the new plan TRW requires retirees to consult with representatives of Extend Health, a subsidiary of Towers Watson, the consulting and actuarial firm that advised TRW on the 2012 changes. Retirees may purchase individual health insurance policies through Extend Health from selected carriers offering policies to post-65 retirees enrolled in Medicare. Under the HRA structure, the "retiree pays their HRA premium direct to the insurance provider," then the "retiree submits their claim to Extend Health," and then "Extend Health reimburses the retiree from their HRA account" to the extent that "financial support" for that account "is provided by TRW."

TRW notified retirees that its "contribution to the HRA will be reviewed annually and is subject to change." TRW "retains the right to amend or terminate the HRA." TRW declared: "TRW Automotive may, at any time, increase, decrease or eliminate the amount that is allocated to your HRA account each year." TRW declared: You are neither vested in your retiree healthcare benefits nor does TRW Automotive intend to vest you in retiree healthcare benefits. To the fullest extent permitted by law, TRW Automotive reserves the right to amend, modify, suspend, replace or terminate any of its plans, policies or programs (including the HRA), in whole or in part, at any time and for any reason, by appropriate company action.

Asked whether the HRAs will go beyond 2013, the TRW representative testified: "I don't know." She testified that "everything is subject to change," that TRW has "sole discretion," and that the HRAs "can be abolished altogether." She does not know "what the plans are for 2014 and beyond."

The UAW asserts that the 2012 healthcare changes shifted company costs, administrative responsibilities and expenses, and financial risk to retirees and their families. The changes also subject retirees to time-consuming and frustrating administrative burdens and to complexity, anxiety, and uncertainty.

TRW asserts that the Sterling Heights CBA did not "shackle the parties in perpetuity to some ironclad retiree benefits structure and/or require them to ignore marketplace improvements and the ability to obtain better coverage at a lower cost." To the contrary, the contract only required TRW to make "suitable arrangements" for coverage. Further, it expressly contemplated changes in retiree health care, in regard to both the primary insurance plan that was offered and the two optional HMOs; TRW has made changes to retiree healthcare a number of times in the past several years; and the HRA structure implemented in 2012 is entirely consistent with these provisions.

**TRW points to a** comparison of the contract language describing retiree healthcare with the language describing active employees' health insurance. The Sterling Heights CBA provision describing retiree healthcare only required TRW to make suitable arrangements" for retirees to "continue such coverages as they had at the time of retirement." It states that this provision did not refer to a particular plan, a particular payment structure or a particular carrier; rather, it referred specifically and exclusively to continuation of ***coverages***. In contrast, other sections of the contract that described health insurance benefits for active employees specifically referenced both plans and insurance carriers, *i.e.*, the Health Alliance Plan, the Blue Care Network and Blue Cross Blue Shield of Michigan. The conclusion is, according to TRW's argument, nothing limited TRW's options as to how it arranged to provide the specified "coverages."

TRW argues that the language that described TRW's financial responsibilities for retiree healthcare provides additional support for TRW's modification rights. While the provisions concerning active employees referred specifically to TRW's "payment"

of "expenses" and "premiums," the retiree provision contained *no* such commitment. Instead, the retiree provision required TRW "to make suitable arrangements" and "monthly contributions on behalf of subscribing retired employees and their eligible dependents towards the cost of such coverage equal to the subscription rate or premium charge for all premiums, but for retired employees enrolled in the [optional HMO plans], not in excess of the amount which the Company would contribute had the retired employees subscribed to the [regular coverages]." Had the contract intended for TRW simply to continue the existing health plans for retirees in perpetuity and to directly pay all insurance premiums associated with them (as the Union claims), this phrasing would have been needlessly obtuse and made little sense. On the other hand, this language is entirely consistent with the intention to provide TRW with the flexibility to periodically adapt retiree health coverage to a rapidly changing healthcare landscape.

TRW argues that in addition to the above language, TRW's right to substitute different coverage for employees in the two HMO plans was explicitly mentioned in the CBA, and was applicable even to active employees. Specifically, the contract provided TRW with "the right to substitute other optional medical plans" if the cost of the optional plans "exceed[ed] what is considered a reasonable premium charge for the level of service." Moreover, retirees who elected this coverage were paying between $11 and $8,900 per month toward their premium, as permitted under the Sterling Heights CBA. This is language that TRW negotiated at the bargaining table and cannot be taken away simply because the Union finds the company's exercise of its rights not to be of its liking.

Noting the positions, assertions and arguments of the parties, an independent examination of the language of Paragraph 32, including all of its sub paragraphs

leads to the following conclusions:

Paragraphs 32.1.1 and 32.1.2 clearly and unambiguously set forth the coverage that must be provided along with specifics about a prescription drug plan and a condition that the Company will pay all premiums which are due under the plan.

Paragraph 32.1.3 affords employees optional hospital-surgical-medical plans, but limits TRW's premiums to a maximum of the amount that is paid for the Paragraph 32.1.1 and 32.1.2 plans. In addition, as to these optional plans, the CBA states that the Company reserves the right to substitute other optional medical plans that provide similar coverage to the above carriers. This right to substitute is set forth only in Paragraph 32.1.3 (Optional Plans) and not in 32.1.1 (Coverage). The inclusion of the option in the paragraph concerning optional plans together with the failure to include this right to substitute regarding the Paragraph 32.1.1 general plan indicates an intent that rights to substitute only apply to the Paragraph 32.1.3 optional plans.

Paragraph 32.1.4 concerns the rights of retired employees. The fact that its provisions (as well as those in Paragraph 32.1.4.1) are subject to Paragraph 32.1.8 will be discussed later in this decision. Paragraph 32.1.4 states that the

> "Company will continue to make suitable arrangements for retired employees to continue such coverages as they had at the time of retirement, subject to the continued availability of such coverages by the carrier. The Company will continue to make monthly contributions on behalf of subscribing retired employees and their eligible dependents towards the cost of such coverage equal to the subscription rate or premium charge for all premiums, but for retired employees enrolled in the coverage described in Paragraph 32.1.3, not in excess of the amount which the Company would contribute had the retired employees subscribed to the coverages provided in paragraph 3 2.1.1. The cost of such coverage in excess of the Company's contributions will continued to be paid by the retired employee. In the event such additional contribution is required, suitable arrangements will be made for the deduction of such contributions of each retired employee who elects this coverage from the monthly

retirement benefit payable to him under the Retirement Income Plan by the Trustee
there under. "

Based on this language it is found that the provisions of paragraph 32 and all its
subsections give bargaining unit employees, who were eligible to and did retire
under this contract, the vested right requiring TRW to make suitable arrangements
for retirees and their eligible dependents to continue receiving such medical plan
coverages they had as active employees at the time of their retirement for their
lifetimes, paid for and administered by TRW.  This coverage is contingent on the
continued availability of such coverages by the carrier.  The "suitable
arrangements" language references an acknowledgement that as outside conditions
affect the availability of "such" medical care, adjustments may have to be made to
continue a similar program.  There is nothing in the record that indicates that such
coverages are not available; therefore, there is no necessity for suitable
arrangements to be made.

Assuming arguendo that TRW had prevailed with its position that, even absent any
lack of availability of the current plan, it retained the right to make reasonable
modifications to the retiree medical plan while still making suitable arrangements
to provide meaningful coverage, the actions of TRW do not constitute "suitable
arrangements" in that they shifted company costs, administrative responsibilities
and expenses, and financial risk to retirees and their families as well as subjecting
retirees to time-consuming and frustrating administrative burdens and to
complexity, anxiety, and uncertainty.

Consistent with what is set forth in Paragraphs 32.1.1 and 32.1.3, retiree
participation in what are designated as optional plans might require additional
premium to be paid by the retiree.  Under Paragraph 32.1.4.1, the surviving spouse

of a retired employee also has such vested right for TRW to continue the coverage provided before the death of the retired employee, subject to the conditions in Paragraph 32.1.4.1.

Paragraph 32.1.8.1, entitled "Effect of Eligibility for Governmental Benefits," indicates "The provisions of this Paragraph 32.1 shall not be applicable to former employees or retired employees (and/or spouses) who are or may become eligible for hospital-surgical-medical expense benefits under Federal law providing such benefits for the public at large." This paragraph specifically applies to benefits "for the public at large." Medicare is not for the public at large. It is limited to those aged 65 or over. If the parties had wanted to indicate Medicare, they could have easily done so by using the title "Medicare." While one may wonder whether the parties were contemplating the establishment of a single payer system, Euro/Canadian socialization of health care or some other iteration, it is clear that the parties did not intend to reference Medicare.

The CBA distinguishes what happens with those aged 65 or over and states that [S]uch provisions (referring to the provisions of Paragraph 32.1 as mentioned earlier in Paragraph 32.1.8.1) shall apply to active employees over age sixty-five (65) unless they have specifically rejected the Company-sponsored benefits provided under this Paragraph 32.1. It goes on to say that [C]ompliance by the Company with such laws (laws for the public at large / not Medicare) shall be deemed full compliance with the provisions of this hospital-surgical-medical program with respect to employees or former employees eligible for benefits under such laws. If, as a result of such laws, the level of benefits provided by any group of employees or former employees or their dependents is generally lower than the corresponding level of benefits under Paragraph 32.1, the Company shall, upon mutual agreement

with the Union, provide plan of benefits supplementary to the benefits provided by law to the extent necessary to make total benefits as nearly comparable as practicable to the benefits provided in Paragraph 32.1 with such contributions by employees or former employees as are mutually determined to be consistent with the contributions established in this Paragraph 32.1.  This language is not applicable to the current dispute as no such law is in effect and there has been no mutual agreement with the union.

These determinations are bolstered by the language of Paragraph 32.1.8.2 that provides for a substitution of plans, referencing Paragraph 32.1.8.1.In stating "The provisions of paragraph 3 2.1.8.1 to the contrary notwithstanding, and upon mutual agreement between the company and the union, the company may, if such laws [meaning the laws referenced in 32.1.8.1 (not Medicare)] permit, substitute a plan of benefits for the benefits provided by the laws referred to in paragraph 32.1.8.1 and modify the applicable provisions to the extent and in the respects necessary to secure the approval of such substitution from the appropriate governmental authority the Company may make such plan available to employees and former employees and require from them such contributions as are mutually determined to be consistent with the contributions established in this paragraph 32.1.  No such "permit" or government approval is needed to opt out of Medicare or substitute another plan.  It is clear that the parties did not reference Medicare as the "governmental benefit" to which Paragraph 32.1.8.1 applies.

Thus, it is found that retirees have a vested right to lifetime hospital-medical-surgical insurance coverage by TRW.  There is no language giving TRW the right to terminate the coverages of Paragraph 32.1 et seq. for any retiree or surviving spouse or eligible dependent.  TRW's actions in terminating the hospital-medical-

surgical insurance coverage and instituting a HRA coupled with reliance on Medicare are in violation of the CBA.

The record shows that TRW, acting pursuant to its obligations under the collective bargaining agreement, substituted a somewhat enhanced hospital-medical-surgical plan administered by Humana for the one administered by Blue Cross / Blue Shield for retirees, their spouses and eligible dependents effective January 1, 2007 without formal objection. At that time, such policy became the accepted standard of performance by both TRW and the beneficiaries, and it is that policy which must be reverted back to as a consequence of the granting of the UAW's motion for summary judgment.

## DECISION AND ORDER

For all the above stated reasons, TRW's motion for summary judgment is denied and the UAW's motion for summary judgment is granted. Unless it obtains agreement with the UAW for another arrangement, TRW shall forthwith rescind the retiree health care changes it implemented on January 1, 2012 in violation of the collective bargaining agreement.

In formulating a remedy it is recognized that the hospital-medical-surgical plan existing prior to January 1, 2012 was offered to the retirees and, as far as can be determined by the record, accepted by the retirees. Therefore, it is that plan which must be considered as agreed upon as the existing iteration of the coverage required pursuant to the retirees' vested right under Paragraph 32.1 et seq. TRW shall restore coverages granted to retirees, their spouses and eligible dependents according to the hospital-medical-surgical plan in effect immediately before the January 1, 2012 change.

UAW, et al.                                                                        Page 24 of 24.
**TRW AUTOMOTIVE U.S., LLC.**
AAA 54 300 00195 12; Retiree Benefits

TRW shall make retirees, eligible dependents, surviving spouses whole for all expenses, costs, fees, and losses incurred as a result of the TRW's breaches and violations, and shall take immediate action to ensure full and prompt "make whole" relief, including gathering the information necessary to quantify "make whole" amounts from its records and from the records of the retirement benefits administrators employed and directed by TRW, and to fully and promptly reimburse those "make whole" amounts, with interest, and TRW shall maintain promised and vested health insurance for the lifetimes of the retirees and their dependents and surviving spouses

Pursuant to Paragraph 4.4 of the CBA, each party shall bear the expense of its own representatives; and all other expenses of the arbitration, if any, shall be shared equally by the parties.  The expenses of the impartial arbitrator, if any, shall be shared and paid equally by the parties.

Dated:
March 1, 2010

_____
Michael P. Long

# American Arbitration Association

## VOLUNTARY LABOR ARBITRATION TRIBUNAL

In the Matter of the Arbitration Between:

**INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW, et al.**

          Plaintiffs/Union.

- and -

AAA No.:    54 300 00195 12
Issue:      Retiree Benefits
Arbitrator:  Michael P. Long

**TRW AUTOMOTIVE U.S., LLC.**

          Defendant/Employer.

## AWARD OF THE ARBITRATOR

**T**HE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into by the above-named Parties, and having been duly sworn and having duly heard the proofs and allegations of the Parties, AWARDS as follows:

For all the reasons stated within the Opinion and Award, TRW's motion for summary judgment is denied and the UAW's motion for summary judgment is granted.  Unless it obtains agreement with the UAW for another arrangement, TRW shall forthwith rescind the retiree health care changes it implemented on January 1, 2012 in violation of the collective bargaining agreement.

In formulating a remedy it is recognized that the hospital-medical-surgical plan existing prior to January 1, 2012 was offered to the retirees and, as far as can be determined by the record, accepted by the retirees.  Therefore, it is that plan which must be considered as agreed upon as the existing iteration of the coverage required pursuant to the retirees' vested right under Paragraph 32.1 et seq.  TRW shall restore coverages granted to retirees, their

spouses and eligible dependents according to the hospital-medical-surgical plan in effect immediately before the January 1, 2012 change.

TRW shall make retirees, eligible dependents, surviving spouses whole for all expenses, costs, fees, and losses incurred as a result of the TRW's breaches and violations, and shall take immediate action to ensure full and prompt "make whole" relief, including gathering the information necessary to quantify "make whole" amounts from its records and from the records of the retirement benefits administrators employed and directed by TRW, and to fully and promptly reimburse those "make whole" amounts, with interest, and TRW shall maintain promised and vested health insurance for the lifetimes of the retirees and their dependents and surviving spouses

Pursuant to Paragraph 4.4 of the CBA, each party shall bear the expense of its own representatives; and all other expenses of the arbitration, if any, shall be shared equally by the parties. The expenses of the impartial arbitrator, if any, shall be shared and paid equally by the parties.

Dated: April 18, 2013

_____
Michael P. Long